IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2015 Session

**STATE OF TENNESSEE v. RODNEY STEPHENS**

**Appeal from the Criminal Court for Campbell County**
**No. 15,070    E. Shayne Sexton, Judge**

_____

**No. E2014-02514-CCA-R3-CD – Filed January 6, 2016**

_____

The Defendant, Rodney Stephens, was convicted by a Campbell County Criminal Court jury of aggravated stalking. T.C.A. § 39-17-315(c)(1)(E) (2010) (amended 2012). The court sentenced the Defendant to three years, with sixty days' confinement and the remainder to be served on probation. On appeal, the Defendant contends that (1) the trial court erred in allowing the trial to proceed despite the absence of a police officer and (2) the evidence is insufficient to support the conviction. We modify the judgment of conviction for aggravated stalking to one for misdemeanor stalking, and we remand the case for sentencing and entry of a judgment of conviction for misdemeanor stalking.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. TIMOTHY L. EASTER, J., filed a dissenting opinion.

Michael G. Hatmaker, Jacksboro, Tennessee, for the appellant, Rodney Stephens.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; William Paul Phillips, District Attorney General; Leif E. Jeffers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to conduct directed at his wife, from whom he was separated at the time of the relevant events. At the trial, Jessica Stephens testified that she and the Defendant were in the process of divorcing and that they were separated on August 19, 2010. She said that at about 9:00 p.m. on August 19, she was seated in her car in a parking lot while waiting for a pizza order and was opening a greeting card envelope when the Defendant banged on her car's window and jerked open the door. She

said the Defendant pinned her throat against the car seat with his forearm and "started snatching" at the card.  She said his physical restraint of her hurt.  She stated that the Defendant "said a lot of things" but that she could not remember some of them two and one-half years later.  She said that the Defendant's behavior was erratic and that she was scared.  She said that when headlights from another car hit her car, the Defendant released her and that she was able to close her car door and drive away.  She said she called 9-1-1 as she left.

Ms. Stephens testified that she drove to a convenience store and went inside.  She said she went into the store to make a purchase and that the Defendant came into the store "screaming and yelling and . . . threatening[.]"  She said a store employee made the Defendant go outside.   She said that the police arrived one or two minutes after she did and that they knew where she was because she had remained on her cell phone with 9-1-1.  The police arrested the Defendant.  Ms. Stephens said she talked to a police officer but did not know his name.  She said that although she had been on her way to work when the incident occurred, she did not go after the incident because she was scared.  She acknowledged that in the application she completed to obtain an order of protection, she had said fifteen minutes elapsed between her leaving the location where the Defendant opened her car door and restrained her and his arrival at the convenience store.  She acknowledged she did not state in the application that the Defendant banged on her car door.

Ms. Stephens testified that on the morning of August 20, 2010, she obtained an order of protection against the Defendant.  She said the sheriff's department called and advised her that the Defendant was being released from jail and that he had been served with the order of protection.  She identified the paperwork she completed to obtain the order.  An exhibit was received, which consisted of three documents:  (1) an untitled form completed by Ms. Stephens requesting an order of protection; (2) a Petition for Orders of Protection, which was signed by Ms. Stephens on August 20 and served on the Defendant at 10:10 a.m. on August 20 by Officer David Goin; and (3) an Ex Parte Order of Protection signed by a judge on August 20, which contained a blank return of service.  Ms. Stephens acknowledged that the return of service on the Ex Parte Order of Protection was unsigned.

Ms. Stephens testified that about two hours after the Defendant was released from jail on August 20, she and her father were traveling to her house when they saw the Defendant and the Defendant's mother in a vehicle on the road.  Ms. Stephens said the Defendant's mother was driving.  Ms. Stephens said the Defendant and his mother turned around and followed her and her father.  Ms. Stephens said that at one point, the Defendant and his mother drove around the vehicle in which Ms. Stephens was traveling

and attempted to block them. Ms. Stephens said the Defendant and his mother drove through a church parking lot and attempted to block her and her father. She said she was surprised to see the Defendant because he was not supposed to have contact with her or her children. Ms. Stephens said she and her father drove around a church at which a 9-1-1 dispatcher told her to stay near until the sheriff's department could respond. She said the sheriff's department found the Defendant and his mother near the church. Ms. Stephens said neither vehicle stopped during the encounter.

Ms. Stephens testified that her next contact with the Defendant was around September 1, 2010, at a Verizon store. She said she was inside paying her cell phone bill when she heard a banging noise and saw the Defendant hitting the window and telling her to come outside. She said that the store's personnel allowed her to go into the back of the store and that Jeff McMann, whom she began dating in approximately October 2010, walked outside. She said a store employee called 9-1-1. She said the Defendant sat in his truck until the police arrived. She said the police arrived quickly, and she thought they arrested the Defendant. She said no physical contact occurred between herself and the Defendant during this incident.

Ms. Stephens testified that her next contact with the Defendant was on September 26 of an unspecified year when the Defendant drove up and down the road in front of her house. She said that he told her daughter he was going to "get" the daughter and that he cursed and made an obscene gesture toward Ms. Stephens. She said the Defendant drove past her house one or two more times. She said she left to go to her grandmother's house and saw the Defendant driving behind her as she pulled into a convenience store. She said that as she pulled into the store, the Defendant called her cell phone. She said he called a second time from his mother's or father's cell phone. She answered the second time because she did not recognize the telephone number. She said the Defendant threatened to hurt her and said she would "pay for this." She said the Defendant circled the store and stopped on the other side. She called 9-1-1 and drove to her grandmother's house. She said that she talked to a police officer that day but that she did not know the officer's name. She was unsure but thought the Defendant was arrested.

Ms. Stephens testified that additional contact between the Defendant and herself had occurred since September 26. She said that she was afraid of him and that, if she saw him today pulling into a store where she was, she would leave quickly.

Dustin Leper, a Verizon salesperson, testified that he was at work on a date he did not recall about two and one-half years ago and that he assisted a couple with a transaction. He said the woman became uneasy and whispered to her companion, "He's out in the parking lot." Mr. Leper said a man outside the store came to the window and

motioned for the woman to come outside, but the man did not come inside. Mr. Leper said that the woman became more nervous and that the woman's companion went outside. Mr. Leper said that he called 9-1-1 and that the police responded in about ten minutes and arrested the Defendant. Mr. Leper identified the woman as Ms. Stephens. He did not recognize the Defendant in court because the Defendant had worn a hat on the day of the incident, but Mr. Leper said he knew the Defendant's name from talking to the officers that day.

Jeffrey McMann testified that he had been romantically involved with Ms. Stephens since late September or early October 2010. He said that on August 19, 2010, he drove to Tennessee from New Jersey. He spoke with Ms. Stephens by telephone and went to the location where she was waiting for a pizza order. When he arrived, he saw a green Toyota T-100 truck blocking Ms. Stephens's car from leaving. He said he heard Ms. Stephens screaming. Mr. McMann said the Defendant had his arm against Ms. Stephens's throat and was reaching over her trying to take something from her hand. Mr. McMann contacted 9-1-1 via the OnStar emergency service in his truck. He said he did not say anything to the Defendant. Mr. McMann said the Defendant left in the Defendant's truck. Mr. McMann followed the Defendant in order to be able to tell the 9-1-1 dispatcher where the Defendant went, but he lost sight of the Defendant after the Defendant made a u-turn.

Mr. McMann testified that he went to a convenience store and saw the Defendant in handcuffs and Ms. Stephens crying in her car. Mr. McMann said that Ms. Stephens was "terrified" and that he stayed with her at her request. Mr. McMann gave a statement to the police. He did not know how much time elapsed between the incident he witnessed and the Defendant's arrival at the store but said "I guess" it would take less than a minute from the location where the Defendant made the u-turn.

Mr. McMann testified that on August 20, 2010, he took Ms. Stephens to obtain an order of protection. He said she was upset and did not want to be alone. He said that after Ms. Stephens obtained the order, they picked up Ms. Stephens's father at Ms. Stephens's grandmother's house and that Ms. Stephens's father received a call from the Defendant. He said that as a result of the call, they went to Ms. Stephens's house. He said that they passed the Defendant and the Defendant's mother, that the Defendant and his mother had been "at the residence coming from the road," and that Mr. McMann, Ms. Stephens, and Ms. Stephens's father pulled over at a cemetery to allow the Defendant to pass. He said that the Defendant and the Defendant's mother pulled into a parking lot nearby and that Mr. McMann rolled down the window and said they were calling the police. Mr. McMann said the Defendant and the Defendant's mother drove away. Mr. McMann said the Defendant's mother was the driver of a maroon or red car. Mr.

McMann said they spoke with Officer Ken Daugherty, who Mr. McMann said arrested the Defendant for violating an order of protection. Mr. McMann acknowledged that the Defendant filed a divorce complaint between August 20 and September 1, 2010. Mr. McMann said he did not know the Defendant's mother and was unaware of Ms. Stephens and the Defendant's mother having any problems.

Mr. McMann testified that on September 1, 2010, he accompanied Ms. Stephens to purchase a cell phone for Ms. Stephens's daughter. He said that as they were looking at a cell phone in the store, the Defendant banged on the store's window, yelled, and motioned for Ms. Stephens to come outside. Mr. McMann said that he told Ms. Stephens to go to the back of the store. Mr. McMann said he went outside and told the Defendant that an order of protection existed. Mr. McMann said he asked the Defendant why he was there, and the Defendant stated he wanted to talk to Ms. Stephens. Mr. McMann said he told the Defendant that Ms. Stephens did not want to talk to the Defendant. Mr. McMann said he told the Defendant he should leave or wait for the police. Mr. McMann said the Defendant climbed into the back of the Defendant's truck, sat down, and waited for the police.

Mr. McMann testified that when he went back inside the store, Ms. Stephens was crying and shaking. He said that he was supposed to go back to New Jersey the next day but that he and Ms. Stephens took a trip together instead. He said that when they returned, they rented a house together until they could find a permanent residence in Sevier County. He said that at the time of the trial, they still lived together in Sevier County. He acknowledged he had stayed with Ms. Stephens and her children at the Defendant and Ms. Stephens's marital home for about one and one-half weeks before September 26, 2010.

Mr. McMann testified that on September 26, 2010, he was at the rental house when "the girls" ran through the house crying and stating that the Defendant was there. Mr. McMann said the girls were "terrified." He said that they were afraid the Defendant "was gonna come back and hurt their mom again" and that he promised them that as long as he was in town, the Defendant would not hurt Ms. Stephens again. He said that Ms. Stephens was upset and that she called 9-1-1. He said that although he had seen the Defendant driving away from the front yard, he did not see the Defendant do anything else.

Mr. McMann stated that his testimony was truthful. He said his testimony had not been influenced by allegations in a lawsuit filed by the Defendant.

Lafollette Police Officer Daniel Smith testified that on August 19, 2010, he was involved in a domestic dispute case pertaining to the Defendant and Ms. Stephens. He said he responded to a convenience store, where he found Ms. Stephens crying and upset. He said the Defendant was not present but was escorted to the station by a Jacksboro officer. Officer Smith said the Defendant stated he had not assaulted Ms. Stephens. Officer Smith arrested the Defendant. Officer Smith said part of the incident occurred in Jacksboro outside a pizzeria.

Campbell County Sheriff's Deputy Ken Daugherty testified that on August 20, 2010, he was dispatched to respond to a call involving the Defendant. He said that as a result of the call, he looked for a maroon Saturn with a female driver. He found the car, which was driven by the Defendant's mother and in which the Defendant was a passenger. Deputy Daugherty said that he told the Defendant and the Defendant's mother why he stopped them and that he left their location and went to the church to talk to Ms. Stephens. Deputy Daugherty later returned. He said he asked the Defendant if the Defendant had the order of protection with him, which the Defendant provided. Deputy Daugherty arrested the Defendant. The prosecutor showed Deputy Daugherty the exhibit consisting of the request for an order of protection form, the Petition for Orders of Protection, and the Ex Parte Order of Protection. Deputy Daugherty acknowledged the exhibit "look[ed] familiar" and said one of his primary responsibilities was to serve orders of protection. The record does not reflect which document or documents within the exhibit Officer Daugherty identified as looking familiar. Deputy Daugherty said the charges relative to the Defendant's August 20 arrest were dismissed.

Campbell County Sheriff's Deputy Josh Vann testified that he responded to a harassment call involving the Defendant on September 26, 2010. Deputy Vann said he went to the address involved in the call and found Ms. Stephens upset and standing in the driveway. He said he looked at Ms. Stephens's cell phone and discovered that the Defendant had attempted to contact her numerous times in the past few hours. He acknowledged that he did not know if the Defendant made the calls and that he only saw the numbers from which calls had been placed. He said a different number appeared more recently in the call log and that this was consistent with what Ms. Stephens told him. He said he did not see the Defendant on September 26.

The Defendant testified that on August 19, 2010, he met Ms. Stephens on the road as he drove toward Lafollette. He said he was going to visit her at work. He said that she turned off her lights and "darted in Charley's [pizzeria]." He said he thought "what in the world," made a u-turn, and pulled beside her car. He said she was behind some apartments when he approached her. He said that although Ms. Stephens was supposed to be at work at a nursing home, her scrubs were in the backseat and she was "dolled up

in new clothes." He said this did not make sense. He said that they had a confrontation because she tried to prevent him from seeing how she was dressed but that he did not open the door and did not touch her. He said he suspected she was having an affair. He said Mr. McMann was not present on August 19. The Defendant said that from inside her car, Ms. Stephens called the Defendant's mother and stated Ms. Stephens was going to call the police. He said that he stayed to hear what Ms. Stephens said, that he told her he was "over it" and was going to divorce her, that she called the police, and that he left.

The Defendant testified that he saw Ms. Stephens at a convenience store later on the evening of August 19. He said that he did not see her until he went inside and that he called her a liar. He said that she started to confront him and that they were both told to leave. He said he left immediately and went to another business. He said Officer Zack Graves escorted him from the other business back to the store. He acknowledged that he was arrested for domestic violence and was in jail until around 1:00 or 2:00 the next day, August 20, 2010. He later acknowledged that the jail records would be accurate if they showed he was released at 11:49 a.m.

The Defendant testified that he was unsure if he was served with an order of protection while he was in jail but acknowledged he was served with something. He said that after he was released from jail, his mother might have taken him to his apartment to shower and change clothes. He said she drove him to the convenience store to get his truck but that it was not there. He said that they went to his house to look for the truck but that it was not there. He said that as they drove back toward town, they saw Ms. Stephens and Mr. McMann in Mr. McMann's truck. The Defendant said he called the police multiple times trying to locate his truck. He said his mother flagged down Ken Daugherty because she thought Deputy Daugherty was responding to the Defendant's 9-1-1 calls. The Defendant said Deputy Daugherty told them to stay where they were and that as they waited, the Defendant saw Ms. Stephens's father "flying by." The Defendant said Deputy Daugherty returned and arrested him for violating an order of protection. The Defendant acknowledged that he knew when he left the jail that an order prohibited any contact with Ms. Stephens and that he had received a copy of the order when he was at the jail. He said the document he showed Deputy Daugherty was the one he received at the jail. He said that on August 20, he was not going to have contact with Ms. Stephens.

The Defendant testified that he filed for a divorce on August 24, 2010. He said that he told Ms. Stephens he was going to do so on August 19 but that he was delayed by his arrests.

The Defendant testified that on September 1, 2010, he pulled into a Verizon store parking lot and saw Mr. McMann. The Defendant said that he "approached to talk to" Mr. McMann, that he was upset because he thought Mr. McMann was involved with Ms. Stephens, and that he and Mr. McMann exchanged words in the parking lot for five to ten minutes. The Defendant denied that he banged on the store's windows and gestured for Ms. Stephens to come outside and that he saw her before the police arrived. He denied that he got into the back of his truck before the police arrived. The Defendant said Officer Zach Graves arrested him. He learned on the day of the trial that Officer Graves was the prosecutor in the case, and he said he had not seen Officer Graves at the trial.

The Defendant testified that on September 26, 2010, he was not in Campbell County because he was working in Bridgeport, Alabama. He said he began work in Alabama on September 20 and remained there for a few months. He said he was arrested when he returned to Campbell County. He said he had records to prove he had been in Alabama but did not have them with him in court.

The Defendant testified that the police were called about an unrelated incident between Ms. Stephens and himself on January 7, 2010. He said the domestic assault charges related to January 7, August 20, September 1, and September 26, 2010, had been dismissed.

The Defendant's mother testified that she picked up the Defendant from jail on August 20, 2010. She said that she drove and that they went to the store to look for his truck and then went to the Defendant and Ms. Stephens's house to determine whether Ms. Stephens had taken the truck there. The Defendant's mother said they called the police four times to escort them to the house but that no one responded. She said that after they left the house, she and the Defendant "passed them" on the road. She said she and the Defendant did not stop and instead continued until she saw an officer, at which point, she stopped and flagged him down because she thought he was responding to their calls. She said the officer informed them that Ms. Stephens had filed a complaint about the Defendant. The Defendant's mother said the officer told them to wait and that he would return. She said that when the officer returned, he said he was going to arrest the Defendant because three people claimed the Defendant had chased Ms. Stephens. The Defendant's mother acknowledged that the officer told the Defendant that Ms. Stephens had an order of protection and that Ms. Stephens said the Defendant violated the order.

The jury found the Defendant not guilty of domestic assault and guilty of aggravated stalking occurring between August 20 and September 26, 2010. This appeal followed.

-8-

# I

The Defendant contends that the trial court violated his confrontation rights by permitting the trial to proceed in the absence of Officer Zack Graves, whom he says was the prosecutor, and that the court erred in denying his motion for a continuance. The State counters that the trial court did not err because the Defendant had no constitutional right to confront Officer Graves and that the Defendant was able to confront and cross-examine Ms. Stephens, the victim of the offense.

## A. Violation of Right to Confront Witnesses

The Sixth Amendment of the United States Constitution provides, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Tennessee Constitution provides, in pertinent part,"[I]n all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face[.]" Tenn. Const. art. I, § 9. Despite slight variations in the wording of the federal and state constitutional provisions, Tennessee courts have generally followed the United States Supreme Court's pronouncements relative to the rights of the accused. *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007). In that regard, the United States Supreme Court has said:

> 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*. The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' (Emphasis in original.) 5 J. Wigmore, *Evidence* § 1395, p. 123 (3d ed. 1940).

*Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *see Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *cf. Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (noting that Confrontation Clause cases fall into two categories: cases involving the admission of an out-of-court statement and cases involving restriction on the right of cross-examination). The State, however, "is not required to call any particular witness in a criminal prosecution[.]" *State v. Osborne*, 712 S.W.2d 488, 492 (Tenn. Crim. App. 1986); *Hicks v. State*, 539 S.W.2d 58, 59 (Tenn. Crim. App. 1976).

The record reflects that at the time of the trial, Officer Graves had moved to Middle Tennessee and was no longer employed with the Jacksboro Police Department. Four days before the trial, the State filed a motion to substitute another officer as the prosecutor. At the trial, defense counsel moved for dismissal of the case or a continuance because Officer Graves was not present. The trial court denied both the State's request to substitute another officer as the prosecutor and the Defendant's request for a dismissal or a continuance. At the trial, the State did not offer any evidence of Officer Graves's prior statements about facts relevant to the offense, and Officer Graves did not testify. The Defendant testified that Officer Graves arrested him on August 19 and September 1, 2010. As we have stated, a defendant's confrontation right preserves the right to confront the witnesses against the accused. In the present case, Officer Graves was not a State's witness against the Defendant, and the Defendant had no constitutional right to confront a potential State's witness who did not testify. The Defendant is not entitled to relief on this basis.

## B. Denial of a Continuance

The Defendant also alleges in the final sentence of his argument relative to his confrontation issue that the trial court erred in denying a continuance due to Officer Graves's absence. He has not supported his allegation with argument or citation to authorities relevant to the denial of a continuance. *See* T.R.A.P. 27(a)(7) (requiring that an appellant's brief shall contain an argument setting forth the reasons appellate relief is required and citations to relevant authorities). Separately from the confrontation issue, the State has not addressed the denial of a continuance based upon Officer Graves's absence. Although we might treat the issue as waived based upon the Defendant's failure to provide an argument and citation to relevant authorities, we will address the issue, to the extent the Defendant contends the trial court should have granted a continuance based on the alleged confrontation violation. *See* Tenn. R. Ct. Crim. App. 10(b).

"[A] motion for a continuance is addressed to the sole discretion of the trial judge," and the judge's decision "will not be disturbed in the absence of a clear showing of gross abuse of discretion to the prejudice of the defendant." *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). It is the appealing party's burden to show how the trial court's decision was prejudicial. *Id*. The critical inquiry "is whether one has been deprived of his rights and whether an injustice has been done." *Id*. As a result, the record must reflect that "the denial of the requested continuance 'denied the defendant a fair trial or that the result of the trial would have been different.'" *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (quoting *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)).

In the present case, the Defendant sought a continuance based upon Officer Graves's absence. The prosecutor stated on the record that Officer Graves had moved to Middle Tennessee, that a subpoena had been sent by certified mail, and that the State had not received any correspondence indicating the subpoena had been served or service had otherwise been accepted. The March 25, 2011 indictment identified Ms. Stephens as the sole witness who testified before the grand jury, and it listed Officer Graves as a State's witness. The trial commenced on January 15, 2014. The Defendant was aware that Officer Graves was a possible witness and could have attempted to serve Officer Graves with process if he so desired. As we have stated above, the Defendant's confrontation rights were not violated when the trial proceeded without Officer Graves. We conclude that the trial court did not abuse its discretion in denying the Defendant's motion for a continuance. The Defendant is not entitled to relief on this basis.

## II

### Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction of aggravated stalking. He argues that no basis existed for the order of protection because the jury found him not guilty of the domestic assault charge that was the predicate offense upon which the order was issued. He also argues that the State failed to prove that he was served with a valid order of protection signed by a judge. The State contends that the evidence is sufficient.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v.*

*Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"'Stalking' means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" T.C.A. § 39-17-315(a)(4). "'Course of conduct' means a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose[.]" *Id.* § 39-17-315(a)(1). "A person commits an offense who intentionally engages in stalking." *Id.* § 39-17-315(b)(1). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" *Id.* § 39-11-106(a)(18) (2010) (amended 2011, 2014). As relevant here,

> A person commits aggravated stalking who commits the offense of stalking . . . , and . . . [a]t the time of the offense, was prohibited from making contact with the victim under a restraining order or injunction for protection, an order of protection, or any other court-imposed prohibition of conduct toward the victim or the victim's property, and the person knowingly violates the injunction, order or court-imposed prohibition."

*Id.* § 39-17-315(c)(1)(E).

> "Knowing" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]"

*Id.* § 39-11-106(a)(20).

The relevant time period for the aggravated stalking count is August 20 to September 26, 2010. Viewed in the light most favorable to the State, the evidence shows that the Defendant repeatedly engaged in conduct that would cause a reasonable person to be terrorized, frightened, intimidated, threatened, or harassed and that Ms. Stephens was actually terrorized, frightened, intimidated, threatened, or harassed. A short period of time after the Defendant was released from jail on August 20, he was a passenger in a car driven by his mother which turned around to follow Ms. Stephens, who testified that the car in which the Defendant rode attempted to block her. On September 1, the Defendant

-12-

went to a Verizon store where Ms. Stephens was a customer, banged on a window, and yelled and gestured for her come outside. On September 26, the Defendant repeatedly drove past Ms. Stephens's house, made threats and an obscene gesture, called her repeatedly and threatened to hurt her, and circled around the convenience store to which she went after the Defendant's conduct at her house. Regarding the Defendant's intent, the record reflects that he knew when he was released from jail on August 20 that the victim had attempted to obtain an order of protection prohibiting him from contacting her. The record also reflects that on August 20, the Defendant showed Deputy Daugherty a document relevant to the order of protection. These facts show the Defendant's knowledge of Ms. Stephens's desire not to have any contact with him and, thereby, his intent to engage in conduct that constituted the offense of stalking.

In order for the offense to be elevated from stalking to aggravated stalking, the State also had to prove that the Defendant was prohibited from contacting Ms. Stephens by an order of protection and that he knowingly violated the order. *See id.*§ 39-17-315(c)(1)(E). As we have stated, the State introduced three documents as a single trial exhibit: (1) the untitled form completed by Ms. Stephens on August 20, 2010, requesting an order of protection; (2) the Petition for Orders of Protection, which was signed by Ms. Stephens on August 20 and which reflects Officer David Goin served it on the Defendant at 10:10 a.m. on August 20; and (3) the Ex Parte Order of Protection signed by a judge on August 20 but which does not reflect service on the Defendant. Both the petition and the order bear a file stamp indicating they were filed by the general sessions court clerk on August 20, 2010 at 9:49 a.m.

Officer Daugherty testified that the Defendant acknowledged the order of protection and that the Defendant showed Officer Daugherty "the paperwork." The record reflects that the prosecutor showed Officer Daugherty the exhibit consisting of the three documents detailed above and that Officer Daugherty acknowledged the exhibit did "look familiar." The record does not reflect which document or documents within the exhibit Officer Daugherty identified as looking familiar.

The Defendant testified that although he was served with a document before he was released from jail on August 20, he was unsure what it was. On cross-examination, the following occurred:

Q. And you knew when you left the jail that there was an order telling you not to have any contact with your wife, right?

A. When I left the jail?

-13-

Q.     Right.

A.     Yeah.

Q.     When you left of [there] on August the 20th, you knew about this order, right?  Somebody had served that on you and gave you a copy of it even, right?

A.     Un-huh (yes).

Q.     In fact, you had it with you a few minutes later when the officer stopped you?

A.     Yes, sir.

Q.     And told him about it and showed it to him?

A.     Yes, sir.

. . . .

Q.     And you're not . . . trying to tell the folks on the jury that you didn't know that you were not allowed to have contact with [Ms. Stephens], right?  I mean, I just want to make – you knew that there was an order of protection, right?

A.     Yes, sir.

The Ex Parte Order of Protection itself does not reflect that the Defendant was aware of the order's existence and its contents.  The Petition for Orders of Protection reflects service on the Defendant by Officer Goin, who did not testify.  Although Deputy Daugherty testified that the Defendant had a copy of an order of protection, Deputy Daugherty's identification of the document the Defendant showed him was not precise. We cannot determine from the record before us whether Deputy Daugherty identified the Petition for Orders of Protection or the Ex Parte Order of Protection, both of which were included in the exhibit he was shown.  The Defendant's testimony supports a conclusion that he was given a document at the jail, but he did not know what the document was.  He said this document was the same one he showed Deputy Daugherty later that day.  We acknowledge that the Defendant affirmed on cross-examination that he was aware on August 20 of an order of protection.

-14-

Resolving the question of whether the Defendant was actually aware of the order of protection is essential to determining whether the Defendant possessed a knowing mens rea to violate the order. We are troubled by the multi-document exhibit, the record's lack of clarity relative to Deputy Daugherty's identification of which document the Defendant showed him; the exhibit showing on its certificate of service that the document the Defendant received was the Petition for Orders of Protection, not the Ex Parte Order of Protection; and the Defendant's testimony that he showed Deputy Daugherty the same document on August 20 that the Defendant had received earlier that day at the jail.

Upon review, we conclude that a rational trier of fact could not conclude beyond a reasonable doubt that the Defendant possessed the culpable mental state of knowingly violating an order of protection. Although the record contains evidence the Defendant knew about the Ex Parte Order of Protection, the record also contains evidence the only document served on the Defendant was the Petition for Orders of Protection. Even when viewed in the light most favorable to the State, the evidence does not establish beyond a reasonable doubt that the Defendant knowingly violated the order. For this reason, the Defendant's conviction of aggravated stalking by knowingly violating an order of protection was improper. As we stated previously, however, the evidence is sufficient to support a conviction of the lesser-included offense of stalking.

In reaching this conclusion, we have not overlooked the Defendant's argument that his conviction of aggravated stalking is infirm because no basis for the order of protection existed due to his acquittal of the domestic assault count. The flaw in this argument is that a person subject to an order of the court may not disregard the order simply because he believes the order is based upon a faulty factual premise. Our supreme court has said:

> A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. *Vanvabry v. Staton*, 88 Tenn. 334, 351-52, 12 S.W. 786, 791 (1890); *Churchwell v. Callens*, 36 Tenn. App. 119, 131, 252 S.W.2d 131, 136-37 (1952). An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal. *Vanvabry v. Staton*, 88 Tenn. at 351, 12 S.W. at 791; *Churchwell v. Callens*, 36 Tenn. App. at 131, 252 S.W.2d at 137. Erroneous orders must be followed until they are reversed. *Blair v. Nelson*, 67 Tenn. (8 Baxt.) 1, 5 (1874).

*Konvalinka v. Chattanooga-Hamilton County Hosp. Authority*, 249 S.W.3d 346, 355 (Tenn. 2008) (footnotes omitted).

In consideration of the foregoing and the record as a whole, we modify the aggravated stalking conviction to one for misdemeanor stalking, and we remand the case for sentencing and entry of a judgment of conviction for misdemeanor stalking.

_____
ROBERT H. MONTGOMERY, JR., JUDGE